**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 22-199-2** |
| **MICHAEL JONES** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

Defendant Michael Jones held an important role in a broad conspiracy that defrauded a wide array of banks and other lenders, as well as the Small Business Administration ("SBA"), by fraudulently obtaining numerous loans. Jones and his conspirators started with SBA 7(a) loans prior to the COVID-19 pandemic and then transitioned to Economic Injury Disaster Loans ("EIDLs") and Paycheck Protection Program ("PPP") loans during the pandemic, taking advantage of an emergency relief effort for their own benefit. To obtain these loans, the conspirators submitted false loan applications. In addition, they provided fake documents to support the false applications. As a result of this deceptive activity, Jones and his co-conspirators secured more than $7 million in fraudulent loan proceeds.

For his part in the conspiracy, Jones worked with a Florida accountant and co-conspirator Frank Hamilton to guide co-conspirator loan applicants through the loan process by obtaining non-functioning businesses for them, creating websites and email accounts for these inactive businesses, helping the loan applicants open business bank accounts to which they directed the fraudulent loan proceeds, and secretly guiding the applicants through interviews with lenders. As planned, loan applicant conspirators turned over the majority of the loan proceeds to Hamilton so

that he could invest the funds for them. While Hamilton returned some of these funds to the conspirators, and gave some of the funds to Jones, Hamilton kept most of the funds for himself.

In addition to helping his co-conspirators obtain fraudulent loans, Jones applied for four loans totaling approximately $827,327 for his own company Foxtrot Systems LLC ("Foxtrot"), Three of those loans, totaling approximately $627,327, were funded.

Altogether, through both the loans with which Jones assisted and his own fraudulent loans, Jones and his co-conspirators caused more than $7 million in losses to banks, lenders, and the SBA. For these reasons, as well as for the reasons provided below, the government recommends a sentence within the advisory guideline range of 70 to 87 months' imprisonment, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted); *see also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I.    <u>BACKGROUND</u>

On September 20, 2022, the defendant pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. During his plea colloquy, the defendant admitted that he filed four fraudulent applications for SBA loans, three of which were funded for a total of $627,327. In addition, he admitted that he assisted co-defendants Peter An, Edwin Bonilla, Tina Chen, Joseph Greco, Frank Hamilton, Timothy Park, Kenny Tran, and others in the fraudulent loan process. After loans were funded, loan participants sent Hamilton most or all of the proceeds of the loans, some of which he returned to them and much of which he retained for himself.

As explained in greater detail in the Presentence Report and the government's plea memorandum, the defendant acknowledged that three types of SBA loans were involved in the conspiracy: 7(a) loans, EIDL loans, and PPP loans. These loans had the following purposes and requirements:

1.    7(a) loans were available prior to, during, and after the pandemic. These loans, which were funded by lenders and partially guaranteed by the SBA, were intended to assist small businesses that might not be able to obtain financing at a

reasonable rate. The SBA used the following information in the applications for these loans to determine whether the applicant qualified for the loan: the number of company employees, the company's annual revenue for the prior three years, the company's need for the loan, and a commitment to use the funds for a business purpose.

2.      EIDL loans and EIDL Advance loans were in existence prior to the pandemic, but expanded to address small business owners needs during the pandemic. The SBA could fund EIDL advance loans up to $10,000, and fund EIDL loans up to $2 million. In order to obtain these loans, applicants had to certify that they provided accurate information about a company's operations, including its number of employees, gross revenue, and cost of goods sold for the 12 months preceding the economic disaster.

3.      PPP loans were intended to enable existing businesses to retain their current employees during the pandemic. In order to obtain an initial PPP loan, an authorized representative of a business had to acknowledge the program's rules, including that the business needed to have been in operation for a certain number of years, and to state, among other things, its average monthly payroll expenses and number of employees. Furthermore, documentation, usually including business tax returns, was required to substantiate payroll expenses. PPP loans were funded by lenders using their own money, and were one hundred percent guaranteed by the SBA. In order to obtain approval, businesses were required to use PPP loan proceeds on certain specific expenses, including payroll. Prior to June 5, 2020, PPP loans were eligible for loan forgiveness if the businesses spent

75 percent of the loan on payroll within a designated period—usually eight weeks after receiving the proceeds. After that date, the requirement dropped to 60 percent. A second draw was also possible if loan requirements were met.

The conspiracy charged in this case was headed by a Florida accountant who prepared documents supporting fraudulent SBA loans for customers throughout the United States, including Frank Hamilton, who was based in California. Hamilton recruited associates to apply for these loans. (He knew these individuals from his church, stock trading classes, or both.) There was no actual business purpose for these loans, as required. Rather, Hamilton and his recruits' intent was to use the funds to invest in the stock market and for their personal use.

Significantly, most of the conspirators did not have a functioning business. As a result, Hamilton and co-conspirator Michael Jones assisted many of them in obtaining a "shelf company," that is, a company that had been created by a vendor who registered a non-functioning business in a state with minimal corporate regulations, paid all required fees for several years, and then sold the company "off the shelf" so that it could be used by individuals who needed to make it appear that they had a company that had been in business for a significant length of time. Jones assisted co-conspirators by, among other things, obtaining shelf companies and creating websites, phone numbers, and email addresses for their non-functioning or minimally functioning businesses. Jones also instructed co-conspirators not to change passwords so that he could continue to have access to their websites and emails.

Furthermore, Hamilton and Jones assisted the co-conspirators with opening bank accounts for those businesses. Hamilton used the names of other co-conspirators and/or the names of co-conspirators' non-functional companies in the applications and back-up documents as employees or vendors of each other's companies. For example, Jones, Hamilton, Tran, Chen,

Park, An, Greco, Bonilla, and others, or companies purportedly owned by fellow conspirators and others appeared on the applications and/or false tax returns submitted in the applications or used as backup documents by members of the conspiracy. In addition, Hamilton and Jones secretly participated in the co-conspirators' phone interviews with lenders so that they could text co-conspirators' false answers to the bank interviewers' questions. As a result of this sophisticated fraud, Hamilton's co-conspirators (Michael Jones, Peter An, Edwin Bonilla, Tina Chen, Joseph Greco, Timothy Park and Kenny Tran, and others) all submitted fraudulent loan applications seeking approximately $9,441,513, prepared by the Florida accountant, with the assistance of Hamilton and Jones during the application and funding process. Approximately $7,088,010 of those loans were funded.

In addition to assisting other conspirators obtain fraudulent loans, Jones himself applied for approximately $827,327 of fraudulent loans for his company Foxtrot, of which approximately $627,327 was funded. As noted above, Foxtrot had no or minimal business functions, actual employees, expenses, or revenue.

These loan applications included an October 2018 application for a 7(a) loan for $200,000 for Jones' non-functioning company Foxtrot, which was denied. Jones then applied to the SBA for an EIDL loan for Foxtrot on or about April 10, 2020. This loan was approved for $118,600. Each of these applications falsely stated the company's number of employees, revenue, and expenses, as well as the time that the company had been in business.

On or about May 7, 2020, Jones filed a fraudulent application for a PPP loan in the name of Foxtrot seeking $259,020. This application included false information about Foxtrot's income, expenses, and employees. After the funds were deposited in Foxtrot's bank account, the next day the Florida accountant sent Jones a schedule of four purported payroll payments that Foxtrot

needed to make to its 13 fictitious employees, who included Hamilton and Tran. Each of these payments was for $52,054, and all were to be paid to Hamilton's company Historic Concepts for a total of $208,054. Jones followed these instructions, making these deceptive transfers to Historic Concepts as scheduled. Shortly after Hamilton received these funds, he transferred the money back to Jones as part of Jones' commission for his role in the conspiracy.

Jones subsequently filed another false application for a PPP second draw for Foxtrot on February 22, 2021, and received an additional $249,707 in loan proceeds. All of these loan applications were made by interstate wire, and there is no record of Jones repaying any of the loans.

Although Jones had the funds to make loan repayments, he chose not to do so. Instead, he used loan proceeds to invest in the stock market, travel, and purchase a fleet of used vehicles for a company he owned that had no relationship to Foxtrot, the non-functioning company he used to apply for the fraudulent SBA loans. Thus, the loans were not repaid. As a result of these actions, Jones and his co-conspirators obtained more than $7 million of fraudulent proceeds through the loans referenced in the Information.

## II.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentence

The maximum sentence that may be imposed on the defendant is a term of imprisonment of 20 years, a term of supervised release of three years, a fine of $250,000, and a special assessment of $100. Restitution of $4,802,562.90 should be ordered.

## B.      Guidelines Calculation

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

| | |
|---|---|
| Base offense level, USSG §§ 2X1.1(a) and 2B1.1(a)(1) | 7 |
| Loss between $3,500,000-$9,500,000, USSG § 2B1.1(b)(1)(J) | 18 |
| Sophisticated means, USSG § 2B1.1(b)(10)(C) | 2 |
| Manager or supervisor of 5 or more people, USSG § 3B1.1(b) | +3 |
| Offense level | 30 |
| Acceptance of Responsibility, USSG § 3E1.1(a) | -2 |
| Assisting in prosecution of own misconduct, USSG § 3E1.1(b) | -1 |
| Total Offense Level | 27 |

Guideline level 27, Criminal History Category I results in a sentencing range of 70 to 87 months' imprisonment.[2]

## III.    ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-

---

[2] Due to the defendant's upward adjustment for his role as manager or supervisor, he is not entitled to an adjustment for zero-point offender. USSG § 4C1.1(a)(10).

Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A.      Consideration of the 3553(a) Factors

#### 1.      The Nature and Circumstances of the Defendant's Crimes

The defendant engaged in a serious offense. He caused more than $7 million in fraudulent loans to be funded, not only through his own fraudulent loans, but through his management of other conspirators, whom he assisted with obtaining shelf companies, business bank accounts, email addresses, phone numbers and websites. He and his co-conspirators filed numerous false applications for loans for which they were not qualified, in which they falsely represented their fictitious businesses' number of employees, revenue, and expenses. They also submitted false tax returns. In addition, the defendant coached them through the interview process, and participated as a silent partner during co-conspirators phone calls with lenders so he

could text them answers to lenders questions. He received a large fee for his services from defendant Hamilton in addition to the proceeds he received from his own fraudulent loans. Despite the large amounts he received from the SBA and from Hamilton, he has not made a single payment on any of his own loans.

Jones' actions contributed to the substantial loss of taxpayer money. Perhaps even more importantly, by committing fraud in programs designed to help small businesses and keep people employed during an economic disaster, it may be more difficult for qualified businesses to obtain needed funds during future times of need. For this reason, as well as to deter others from engaging in the same type of loan fraud, a sentence within the guideline range is appropriate.

### 2. The History and Characteristics of the Defendant

The defendant is 58 years old. He is a lifelong resident of California. He had a self-described positive childhood, growing up with both parents and his sister. The defendant described his childhood as "normal." He never married and does not have any children. He has lived in multiple locations in California, including with defendant Hamilton and his family from 2015 to 2017. Since August 2022 Jones has resided in an apartment with his sister and niece. For many years he was a personal trainer, after which he worked with Hamilton to add people as authorized users to other individuals' credit cards in order to improve the authorized users' credit scores. He currently works 20 to 25 hours per week as a behavioral specialist where he accompanies two autistic teenagers to class and locations in their community. He also works an additional 30 hours per week as a counter salesperson and delivery driver for an auto parts company.

Nothing in the defendant's history or personal characteristics would provide the basis for a variance from the sentencing guidelines.

- 10 -

**3.      The Need for the Sentence Imposed To Reflect
the Seriousness of the Offense, To Promote Respect for the Law,
and To Provide Just Punishment for the Offense**

It is important that the sentence imposed on Jones reflect the seriousness of his role as a manager of a more than $7 million fraud upon lenders and the government. The funds that Jones and his co-conspirators obtained through fraud had been allocated to support small businesses before and during the pandemic. This offense limited the funds available to genuine business applications and contributed to the erosion of trust in the relief programs that were designed to help small businesses. A guideline sentence would reflect the seriousness of the offense and promote respect for the law.

**4.      The Need for Adequate Deterrence and Protect the Public
from Further Crimes by the Defendant**

The need for deterrence under Section 3553(a) is not limited to deterrence of the particular defendant. As the courts have noted, general deterrence and respect for the law are also factors which the courts may consider.  *See, e.g.*, *United States v. Jordan*, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); *United States v. Glover*, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-*Booker* and post-*Booker*, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); *see also United States v. Yeaman*, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation"). Here, general deterrence is particularly important. The defendant committed a $7 million fraud. Other defendants enticed by greed should be sent a message that such conduct will be severely punished.

- 11 -

Moreover, specific deterrence is also needed. The defendant played a managerial role in this conspiracy, and despite receiving a significant portion of the fraud proceeds, he appears to have made no effort to make any repayment on his own loans.

For these reasons, a sentence within the guideline range would provide deterrence to both this defendant and others who consider engaging in loan fraud.

### 5.     The Need To Avoid Disparities

While every case is unique, the government's recommended sentence will avoid unwarranted sentencing disparities. The guidelines themselves "are designed to restrain unwarranted disparities." *United States v. Sample*, 902 F.3d 1196, 1201 (10th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 54 (2007)). That is what the government requests here. 18 U.S.C. § 3553(a)(4), (a)(6). The guidelines here appropriately account for the defendant's conduct and leadership and reflect potentially mitigating factors, such as his willingness to accept responsibility for his actions by giving him credit for accepting responsibility. Of the co-conspirators facing sentencing, Jones is one of the most culpable and his sentence should reflect that fact.

### 6.     Educational or Vocational Training and Medical or Correctional Treatment

The defendant has an associate degree from a community college, and has attended, but not graduated from, several universities in California. He has a personal trainer certificate and currently aspires to become an x-ray technician. He is employed in two part-time jobs as a behavioral specialist and a salesperson/truck driver. The defendant, therefore, is not in need of educational or vocational training.

The defendant does not appear to require treatment for any physical or mental health conditions.

**7.      The Kinds of Sentences Available**

As stated previously, the defendant is subject to a prison sentence. He could receive supervised release. He could receive a fine. A special assessment of $100 is mandatory.

**8.      Restitution**

Restitution of $4,802,562.90 should be ordered in this case.[3]

For the reasons stated above, all of the appropriate considerations of sentencing favor the imposition in this case of a within-guideline sentence. As noted, the Sentencing Guidelines present "the lodestone of sentencing," *Peugh*, 569 U.S. at 544, and that guide is once again persuasive in this case.

**B.      Supervised Release**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the

---

[3] The government will provide the names and addresses of victims in this case, as well as the amounts due to those victims. Most restitution payments will be joint and several with defendant Hamilton as well as at least one additional co-conspirator.

exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of three years is warranted. A term of supervised release will aid the defendant's reentry to society and will advance the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), and ensure payment of restitution to victims, § 3553(a)(7).

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3, as well as these additional conditions: the defendant shall provide the probation office with regular reports of his finances; he shall not obtain any new loans or credit without permission of the Probation Office; and he shall not liquidate or encumber any asset without permission of the Probation Office.

## IV. CONCLUSION

The government's final recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Judy Smith*
JUDY SMITH
Assistant United States Attorney

MARGARET A. MOESER
Chief, Money Laundering, Narcotics
& Forfeiture Section

- 14 -

/s/ *Varun Trivedi*
VARUN TRIVEDI
Trial Attorney, Money Laundering, Narcotics
& Forfeiture Section

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this Sentencing Memorandum has been served by email on Tigran

Martinian, Esq. at tm@martinianlaw.com.


/s *Judy Smith*
JUDY SMITH
Assistant United States Attorney


DATED:  <u>April 21, 2026</u>

- 16 -